**Richard HOFFER, Plaintiff,**

v.

**INFOSPACE.COM, INC., and Naveen Jain, Defendants.**

**No. Civ.A. 99–5881 (AJL).**

United States District Court, D. New Jersey.

June 29, 2000.

---

Robert Novack, Mary L. Moore, Kenneth J. Cesta, Edwards & Angell, LLP, Short Hill, NJ, for plaintiff.

Thomas F. Campion, Drinker Biddle & Shanley LLP, Florham Park, NJ, Harry H. Schneider, Jr., Perkins Coie LLP, Seattle, WA, for defendants.

## OPINION

LECHNER, District Judge.

This is an action brought by plaintiff, Robert Hoffer ("Hoffer"), against defendants InfoSpace.com, Inc. ("Infospace") and Naveen Jain ("Jain") (collectively, the "Defendants"). On 15 December 1999, Hoffer filed a complaint (the "Complaint") that alleges, *inter alia,* a claim for damages for breach of contract, misrepresentation, fraud, breach of the covenant of good faith and fair dealing and promissory estoppel. *See* Complaint, ¶¶ 1, 22–44. Hoffer further alleges the instant matter is within the jurisdiction of this court pursuant to 28 U.S.C. § 1332, *see id.,* ¶ 2, and venue is properly laid in this District pursuant to 28 U.S.C. § 1391(a) ("Section 1391(a)"). *See id.* On 31 January 2000, the Defendants filed an answer and counter claims (the "Answer/Counterclaims"). In particular, the Defendants allege Hoffer breached the terms of a loan agreement with Infospace, misappropriated trade secrets and breached a confidential relationship with his employer, Infospace. *See* Answer/Counterclaims, ¶¶ 60–66.

Currently pending is a motion, filed by the Defendants, to dismiss the action, pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure for improper venue based on a forum selection clause (the "Forum Selection Clause") contained in an employee non-disclosure agreement (the

"NDA") entered into by Hoffer and Infospace. In the alternative, the Defendants request that the court transfer the action (the "Motion to Transfer")[1] to the United States District Court for the Western District of Washington (the "Western District of Washington") to cure a defect in venue, pursuant to 28 U.S.C. § 1406 ("Section 1406") and, or, for the convenience of the parties and witnesses, pursuant to 28 U.S.C. § 1404(a) ("Section 1404(a)").

For the reasons set out below, the Motion to Transfer is granted; the action is transferred for all purposes to the United States District Court for the Western District of Washington.

*Background*

### A. *Parties*

Hoffer currently resides at One East Elbrook Drive in Allendale, New Jersey. *See* Complaint, ¶ 3. It appears Hoffer has been engaged in the business of licensing "yellow and white pages data" and syndicated services to internet, software, database, telecommunications and media firms. *Id.,* ¶ 7. Hoffer alleges he began working for Infospace in or around the "late Spring of 1996 on a consulting basis." *Id.,* ¶ 11.

Jain is the President and Chief Executive Officer of Infospace and resides in the State of Washington. *Id.,* ¶ 4. *See also* Answer/Counterclaims, ¶¶ 4–5. Infospace is a Delaware corporation with its principal place of business located in Redmond,

Washington. *Id.,* ¶ 5. *See also* Answer/Counterclaims, ¶¶ 4–5. Infospace was founded in or around March 1996. *Id.,* ¶ 6. Hoffer alleges Infospace is a provider of internet services. *Id.* Hoffer further alleges Infospace provides these services through its yellow pages, white pages and e-mail directories. *Id.*

### B. *Facts*

As mentioned, Hoffer alleges the Defendants breached the terms of an employment agreement and, in addition, have prevented Hoffer from exercising certain stock options given to him in an employment agreement, dated 25 June 1996 (the "25 June 1996 Employment Agreement"). *See id.,* ¶ 19.

Prior to March of 1996, it appears Hoffer was the general manager of the "electronic/interactive" media division of a firm known as Database America Companies, Inc. ("DAC"), located in Montvale, New Jersey. *See id.,* ¶ 7. As mentioned, Hoffer was engaged in the business of licensing yellow and white pages data and syndicated services to internet, software, database, telecommunications and media firms. *See id.*

In or around March 1996, Hoffer alleges Jain approached him in New Jersey and had various discussions and meetings with Hoffer, in an attempt to solicit Hoffer to join him in a "new business venture"[2] *See*

---

1. In support of the Motion to Transfer, the Defendants submitted: a Brief in support of Defendants' Motion to Dismiss or, Alternatively, to Transfer Venue (the "Moving Brief"), affidavit of Anu Jain (the "A. Jain Aff."), affidavit of Naveen Jain (the "N. Jain Aff."), affidavit of Brent Snyder (the "Snyder Aff."), Defendants' Reply Brief in support of Motion to Dismiss or, Alternatively, Transfer Venue (the "Reply Brief") and an affidavit of Joseph M. McMillan (the "McMillan Aff.").

   In opposition to the Motion to Transfer, Hoffer submitted: Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss or, Alternatively, Transfer Venue (the "Opp. Brief"), affidavit of G. Kent Plunkett (the "Plunkett Aff."), affidavit of Timothy Kay (the "Kay Aff.") and an affidavit of Mary L. Moore (the "Moore Aff.").

2. This characterization of the initial meeting between Hoffer and Jain is in contrast to the deposition testimony of Hoffer. According to his deposition testimony, it appears Hoffer met Jain in conjunction with his performing due diligence for DAC regarding a business venture proposed by Jain to DAC, not Hoffer. *See* Hoffer Dep. at 22:14–23, attached as Ex. A to the Snyder Aff. (Q: "What was the context in which you met [Jain]?" Hoffer: "I was there to evaluate Naveen Jain's business experience, essentially for due diligence *on behalf of [DAC].*" Q: "Perhaps you can give me a little bit more background. Did Mr. Jain approach [DAC]?" Hoffer: "Mr. Jain approached [DAC] to do or *enter into a business relationship with [DAC].*") (emphasis added).

*id.,* ¶ 8. It is alleged that the "new business venture" later became known as Infospace. *See id.* Hoffer alleges Jain indicated that because the "new business venture" was a start-up, he could not pay Hoffer a salary that was commensurate with what Hoffer was earning at DAC. *See id.* It is alleged, however, that Jain represented that Hoffer "would share in the venture through the issuance of common stock. Jain further represented ... that he ... was wealthy from his prior employment with Microsoft and as such, Jain wouldn't need to take a salary and that Jain would also be compensated in the form of the issuance of stock." *Id.* ¶ 10.

In or around the late Spring of 1996, Hoffer began working with Jain on a consulting basis. *See id.,* ¶ 11. Hoffer alleges he agreed to work with Jain to build an internet directory services company. *See id.,* ¶ 12. For his part, Hoffer alleges he created a sales presentation for "co-branding" services as well as a revenue model for the business. *See id.* Hoffer further alleges he introduced Jain to several clients including "Playboy, the New York Times, The Wall Street Journal, Infoseek, Web TV, Advanced Internet and Riddler/Interactive Imagination." *Id.,* ¶ 13. In addition, Hoffer alleges he "demonstrated to Jain a directory service application capable of supporting high traffic query and response into very large databases via HTTP." *Id.,* ¶ 14. Hoffer alleges he introduced Jain to Timothy Day, a software developer, capable of engineering the software necessary to operate the directory services that Infospace was to provide to its customers. *Id.,* ¶ 15.

Indeed, Jain and Hoffer had no other contact in New Jersey and did not begin discussing the possibility of Hoffer coming over to Infospace until later in 1996 when the parties contacted one another via telephone and e-mail. *See id.* at 24:9–15 (Q: "And what was your follow-up after the meeting?" Hoffer: "Naveen Jain called me on the telephone at [DAC].... In fact, after meeting Naveen Jain, his calls to me were constant during my business day.").

**3.** It is undisputed that Hoffer and Jain executed the 25 June 1996 Employment Agreement

Hoffer alleges he left DAC and officially joined Infospace based on the representation of Jain that Hoffer would be a 50% partner with Jain. *See id.,* ¶ 16. Hoffer specifically alleges he "quit [DAC] in New Jersey and joined Infospace at its new offices in Redmond, Washington." *Id.* Upon arrival at Infospace, Hoffer alleges Jain "unilaterally reduced" his prior employment offer of a 50% partnership interest in Infospace and, instead, presented Hoffer with various employment proposals. *See id.,* ¶ 17.

On or about 1 June 1996, Hoffer alleges Jain forwarded to him a "letter agreement" that provided that Hoffer would be paid $50,000 and granted the option to buy up to 300,000 shares of stock at $.10 per share. *See id.,* ¶ 17. As a result of this new employment proposal, it is alleged that Hoffer and Jain entered into negotiations concerning an acceptable employment arrangement. *See id.* It appears that on 25 June 1996,[3] Jain provided Hoffer with an employment agreement (see 25 June 1996 Employment Agreement), by which Jain granted Hoffer, in part, the right to the immediate purchase of up to 75,000 shares of stock at $1.00 per share.

Hoffer alleges the 25 June 1996 Employment Agreement was executed by Jain and accepted by Hoffer. *See id.* Thereafter, Hoffer alleges he began working as an Infospace employee for a period of approximately four months. *See id.,* ¶ 18. Hoffer, however, alleges Jain fired him over the telephone during a business trip. *See id.*

and the NDA on 25 June 1996. It appears, however, the parties backdated these documents to 14 June 1996 to reflect to actual date of acceptance by Hoffer of the employment offer extended to him by the Defendants. *See* Hoffer Dep. at 14:16–19, attached as Ex. B to the McMillan Aff. (Hoffer: "I signed th[e] document[s] on June the 25th and backdated it June 14th of 1996, when I accepted the offer of employment at Infospace Corporation.").

Upon information and belief, Hoffer alleges that Jain has "engaged in a pattern and practice of soliciting the involvement and employment of key personnel of competing business by promising them senior management positions and lucrative compensation packages ... and then terminating the employee and reneging on his promises and agreements." *Id.*, ¶ 20.

In count one of the Complaint, Hoffer alleges Infospace breached the 25 June 1996 Employment Agreement. *See id.*, ¶ 23. Hoffer, moreover, alleges he has performed the terms of the 25 June 1995 Employment Agreement and completed all conditions necessary to entitle him to exercise the options contained in the 26 June 1996 Employment Agreement. *See id.*

In count two of the Complaint, Hoffer alleges the Defendants "breached the covenant of good faith and fair dealing implied in every contract." *Id.*, ¶¶ 26–27.

In count three and count four of the Complaint Hoffer alleges the Defendants committed fraud and made negligent misrepresentations in that they misrepresented "material facts inducing [Hoffer] to terminate his employment with [DAC] and to accept an employment position with Infospace and to provide infospace with [Hoffer's] contacts and industry knowledge." *Id.*, ¶ 29. Hoffer specifically alleges that based on the representations of Jain concerning "founders equity," he introduced the Defendants to various business contacts that are today part of the Infospace network. *See id.* Hoffer further alleges he introduced the Defendants to "technical people who were able to develop the database engineering tools that are used in creating the directory service and products provided by Infospace...." *Id.*

In addition, Hoffer alleges that based on the representations of Jain, he left his position at DAC and joined Infospace in Redmond, Washington, "where he was provided with paperwork which was different than the representations that have been made by Jain to induce Hoffer to leave his prior employment." *Id.*, ¶ 30. *See also id.*, 35–36.

Finally, in count five of the Complaint, Hoffer alleges the Defendants are estopped from denying the terms of the 25 June 1996 Employment Agreement because Hoffer reasonably relied on the misrepresentations and inducements made by the Defendants. *See id.*, ¶¶ 40–44.

*Discussion*

### A. The Forum Selection Clause

As mentioned, the Motion to Transfer is based, in part, on the Forum Selection Clause contained in the NDA negotiated and signed by Hoffer and Infospace in Redmond, Washington. *See* Moving Brief at 4–5, 8–14; Reply Brief at 2–9. The Defendants argued that as a result of the employment negotiations between Hoffer and Jain (which took place exclusively in Redmond, Washington) Infospace drafted, and Hoffer signed the 25 June 1996 Employment Agreement and the NDA at Infospace headquarters. *See* Moving Brief at 5. The Defendants specifically argued that the Forum Selection Clause "requires that actions arising out of [Hoffer's] employment with Infospace be filed in state court in King County, Washington or in the Untied States District Court for the Western District of Washington." *Id.* at 8. The Forum Selection Clause stated, in relevant part, that the parties agreed

> that this agreement shall be governed for all purposes by the laws of the State of Washington as such law applies to contracts to be performed within Washington ... and that venue for any action arising out of this Agreement shall be properly laid in King county, Washington or in the Federal District Court of the Western District of Washington....

NDA, ¶ 14, attached as Ex. B to the A. Jain Aff. In sum, the Defendants argued that the Forum Selection Clause is valid. They contend that it should be enforced because Hoffer cannot meet his burden of *clearly* establishing that such enforcement

would be "unreasonable and unjust, or that the [Forum Selection Clause] was invalid for such reasons as fraud or overreaching." Moving Brief at 10 (citations omitted). *See also* Reply Brief at 6–10.

■ The Circuit has noted that the construction of a contract is usually a matter of State, not Federal, common law. *See Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 441 (3d Cir.1999); *Danka Funding v. Page, Scrantom, Sprouse, Tucker & Ford*, 21 F.Supp.2d 465, 474 (D.N.J.1998) (citing *General Engineering Corp. v. Martin Marietta*, 783 F.2d 352, 356 (3d Cir.1986)). Accordingly, the initial step in the instant matter is to determine which State law to apply when considering whether the Forum Selection Clause is an enforceable part of the employment agreement entered into between the parties. *See Danka Funding*, 21 F.Supp.2d at 469.

■ The language of the Forum Selection Clause itself, therefore, is not authority for what law to apply. Rather, a Federal court sitting in diversity must utilize the choice of law rules of the forum State— New Jersey. *See Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *On Air Ent. Corp. v. Nat'l. Indem. Co*, 210 F.3d 146, 149 (3d Cir.2000); *Assicurazioni Generali v. Clover*, 195 F.3d 161, 164 (3d Cir.1999) (stating that "[D]istrict [C]ourt in . . . diversity action [is] obligated to apply the forum's . . . choice of law rules in resolving the parties' dispute. . . ."); *Robeson Indus. Corp. v. Hartford Acc. & Indem. Corp.*, 178 F.3d 160, 164 (3d Cir.1999) (same); *Danka Funding*, 21 F.Supp.2d at 469.

New Jersey courts implement the "governmental-interest" approach to choice of law questions, which requires application of the law of the State with the greatest interest in resolving the particular issue raised by the underlying litigation. *See On Air Ent.*, 210 F.3d at 149; *Robeson*, 178 F.3d at 164; *Gantes v. Kason Corp.*, 145 N.J. 478, 484–493, 679 A.2d 106 (1996). *Cf. Pfizer, Inc. v. Employers Ins. of Wausau*, 154 N.J. 187, 712 A.2d 634 (1998); *HM Holdings, Inc. v. Aetna Cas. & Sur. Co.*, 154 N.J. 208, 712 A.2d 645 (1998) (decided concurrently with *Pfizer*); *Unisys Corp. v. Insurance Co. of N. Am.*, 154 N.J. 217, 712 A.2d 649 (1998) (same); *Gilbert Spruance Co. v. Pennsylvania Mfrs.' Ass'n Ins. Co.*, 134 N.J. 96, 629 A.2d 885, (1993).

"The initial prong of the governmental-interest analysis entails an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis." *Gantes*, 145 N.J. at 484–493, 679 A.2d 106. In the absence of an actual conflict, the law of the forum State—in this case, New Jersey—is applied. *See On Air Ent.*, 210 F.3d at 149; *Danka Funding*, 21 F.Supp.2d at 469 (citing *Schreiber v. Camm*, 848 F.Supp. 1170, 1174 (D.N.J. 1994)).

■ In the instant matter, no actual conflict exists with respect to the standard for consent to forum selection clauses in contracts; the courts of New Jersey and Washington are in accord with the law as set out by the United States Supreme Court in *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972),[4] and its progeny. *Compare Copelco Capital Inc. v. Shapiro*, 331 N.J.Super. 1, 4, 750 A.2d 773 (App.Div. 2000) (stating that "forum selection clauses are generally enforced in New Jersey." "Nevertheless, such provisions will not be given effect if they are the result of 'fraud or coercive bargaining power,'" or if enforcement of the clause would "be seriously inconvenient for the trial."); *Caspi v. Microsoft Network*, 323 N.J.Super. 118,

---

**4.** In *M/S Bremen*, the Supreme Court, pursuant to Admiralty jurisdiction, held that forum selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *Id.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (internal quotations omitted).

122, 732 A.2d 528 (App.Div.1999); *Shelter Systems v. Lanni Builders*, 263 N.J.Super. 373, 375, 622 A.2d 1345 (App.Div.1993) *with In re Matter of Kronenberg Family Trust*, 2000 WL 17178, 1 (Wash.App.Div. 10 Jan. 2000) (unpublished) (observing that "Washington will enforce a forum selection clause unless it is unreasonable and unjust."); *Voicelink Data Services, Inc. v. Datapulse, Inc.*, 86 Wash.App. 613, 618, 937 P.2d 1158 (1997) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n. 14, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

■ Analysis of the Forum Selection Clause, therefore, is necessarily predicated on the "M/S Bremen standard" as applied by this Circuit. *See Danka Funding*, 21 F.Supp2d. at 470 (stating that "[t]his [c]ourt will therefore apply M/S Bremen standard as it has been applied in New Jersey and this Circuit, occasionally looking to the United States Supreme Court for guidance."). The Circuit, in accordance with the "M/S Bremen standard," deems forum selection clauses presumptively valid. *See Reynolds Pub., Inc. v. Graphics Financial Group, Ltd.*, 938 F.Supp. 256, 263 (D.N.J. 1996). In this regard, the Circuit directs that forum selection clauses should be enforced unless the party objecting to enforcement establishes that "it would be the result of fraud or overreaching, enforcement would violate a strong public policy of the forum, or that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." *Id.*, at 263. *See also Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1297–98 (3d Cir.1996); *Danka Funding*, 21 F.Supp.2d. at 470.

■ The arguments set forth by Hoffer, in support of his contention that the Forum Selection Clause is unreasonable and, therefore, unenforceable, are without merit. For example, Hoffer argued, in part, that the presumptive validity of the Forum Selection Clause is overcome because it was the "result of fraud or overreaching[,] ... that enforcement would violate a strong public policy of the forum[,] or ... that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." Opp. Brief at 22.

1. *Fraud, Overreaching and, or, Undue Influence*

Hoffer argued that the Forum Selection Clause is invalid because "Jain fraudulently misrepresented that he and Hoffer would be partners with equal numbers of Infospace shares, thereby inducing Hoffer to resign from his position at [DAC]." [5] *Id.* at 23.

■ While it is true that a forum selection clause may be set aside if it is the product of fraud or overreaching, *see Danka·Funding*, 21 F.Supp.2d at 470, this is so *only* where the "inclusion of that clause in the contract was the product of fraud or coercion." *Id.* (citing *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). In other words, fraud and overreaching are grounds for setting aside a forum selection clause only if it is determined that the inclusion of the forum selection clause in the contract was the product of deception and, or, coercion. It is insufficient, there-

---

**5.** In further support of the contention that the Forum Selection Clause was the product of "fraud or overreaching," Hoffer argued that the Defendants engaged in a "pattern and practice of defrauding industry competitors into joining Infospace with false promises of stock options and employment...." Opp. Brief at 23.

Hoffer, however, failed to provide any facts, much more case law, indicating how the rela-

tionship between the Defendants and individuals wholly unrelated to this litigation bare on whether the Forum Selection Clause was arrived at through either "fraud or overreaching;" or on the ultimate issue in dispute—whether the Defendants breached the employment agreement entered into by Jain and Hoffer.

fore, "to allege that one was induced generally to enter into the contract itself as a result of fraud." *Nat'l Micrographics Sys. v. Canon U.S.A.,* 825 F.Supp. 671, 675 (D.N.J.1993).

In the instant matter, however, Hoffer merely argued that the Defendants, in an initial employment discussion, "fraudulently misrepresented that [Jain] and Hoffer would be partners with equal numbers of Infospace shares...." Opp. Brief at 23. Significantly, Hoffer did not argue that the inclusion of the Forum Selection Clause in the NDA was a result of either fraud, deception and, or, coercion on the part of the Defendants. *See Danka Funding,* 21 F.Supp2d. at 470; *Nat'l Micrographics Sys.,* 825 F.Supp. at 675.

Even assuming arguendo that Hoffer argued the inclusion of the Forum Selection Clause in the NDA resulted from fraud or coercion, there are simply no facts to support such a conclusion. For example, the Complaint does not mention, much more allege, that the Forum Selection Clause, or even the NDA or the 25 June 1996 Employment Agreement, was the product of fraud or coercion. *See* Complaint, ¶¶ 16–18. To the contrary, Hoffer alleges that

> [o]n or about June 1, 1996 Jain provided [him] with a proposed letter agreement that provided, in pertinent part, that [he] was to be paid an annual salary of $50,000 and granted [him] the option to buy up to 300,000 shares of stock at $.10 per share.
>
> Thereafter, *negotiations between Jain and Hoffer ensued.* Jain then provided Hoffer with a letter agreement dated as of June 25, 1996 that granted Hoffer the immediate right to purchase up to 75,000 shares of stock at $1.00 per share. *The June 25, 1996 Agreement was executed by Naveen Jain, as President of Infospace and accepted by Hoffer.* Thereafter, Hoffer worked as an employee for Infospace for a period of approximately 4 months....

*Id.,* ¶¶ 17–18 (emphasis added). Hoffer similarly characterized the employment "negotiations" that took place in Redmond, Washington in "Plaintiff's Answers and Responses to Defendants' First Set of Interrogatories and Request for the Production of Documents" (the "Answers and Responses"), attached as Ex. B to the Snyder Aff. For example, Hoffer specifically stated:

> Thereafter, negotiations between Jain and Hoffer ensued. On or about June 14, 1996 during a meeting at Infospace's offices in Redmond, Washington, Jain provided Hoffer with an employment agreement ... that granted Hoffer immediate right to purchase up to 75,000 shares of stock at $1.00 per share (the "Agreement"). *The Agreement memorialized the terms of Hoffer's employment with Infospace, and was executed by Jain as President of Infospace and by Hoffer on June 14, 1996, and witnessed by Timothy Kay.*

> \*   \*   \*   \*   \*   \*

> Thereafter, on or about June 14, 1996, Jain promised Hoffer employment pursuant to the terms of the ... Agreement—*which terms Hoffer accepted....*

Answers and Responses, Answers to Interrogatory No. 2 & 15, attached as Ex. B to the Snyder Aff. (emphasis added).

The deposition testimony of Hoffer, moreover, appears to undermine any assertion that either the 25 June 1996 Employment Agreement, the NDA, or the Forum Selection Clause was executed as a result of fraud or coercion on behalf of the Defendants.

Q: Okay. My question was, did you sign [the 25 June 1996 Employment Agreement]?

Hoffer: Yes, I did. I signed this document on June the 25th and backdated it June the 14th of 1996, when I accepted the offer of employment at Infospace Corporation.

Q: Fair enough. And that is your signature on page two; correct?

Hoffer: Yes, that is my signature, as well as Anu Jain's signature.

Q: Right, and under your signature is your name. Did you write that, or did someone else; do you know? Is that your—writing?

Hoffer: Yes, this is my writing. I believe I signed this document after I signed the employment agreement on the same exact date. In fact, I'm quite sure it was after I had signed the employment agreement for Infospace.

Q: Okay. When you signed those two documents, did you expect and intend that Infospace would abide by them?

Hoffer: When I signed these two documents, did I expect that Infospace would abide by the terms and conditions of those documents? Yes, Sir, I did.

Q: All right. And you're not changing your mind about what the deal was; it's set forth in [the 25 June 1996 Employment Agreement and the NDA], right?

Hoffer: The arrangements between myself and Infospace are embodied in this letter [the 25 June 1996 Employment Agreement] and in this agreement [the NDA]. I signed th[e][NDA] after I singed th[e] [25 June 1996 Employment Agreement].

Hoffer Dep. at 14:14–19; 15:1–7, 17–25; 134:21–25; 135:1.

As mentioned, the Forum Selection Clause stated, in relevant part, that

> this agreement shall be governed for all purposes by the laws of the State of Washington as such law applies to contracts to be performed within Washington ... and that venue for any action arising out of this Agreement shall be properly laid in King county, Washington or in the Federal District Court of the Western District of Washington....

NDA, ¶ 14, attached as Ex. B to the A. Jain Aff.

It appears, therefore, that the plainly stated Forum Selection Clause was not the product of fraud or coercion on behalf of the Defendants. *See M/S Bremen,* 407 U.S. at 12 n. 14, 92 S.Ct. 1907 (holding that there was no evidence of fraud or undue bargaining power where "[t]he forum selection clause could hardly be ignored [because] [i]t is the final sentence of the agreement, immediately preceding the date and the parties' signatures."); *BABN Technologies Corp. v. Bruno,* 25 F.Supp.2d 593, 595–96 (E.D.Pa.1998) (holding that a forum selection clause is not a product of fraud where it is "written in plain English and is located in uniform type directly above [the party's] signature line in the agreement."). Accordingly, it does not appear fraud and overreaching are grounds on which Hoffer can challenge the validity of the Forum Selection Clause.

### 2. *State and Federal Public Policy*

Hoffer argued that the enforcement of the Forum Selection Clause would "violate important [S]tate and [F]ederal public policies." Opp. Brief at 23. Hoffer specifically argued that enforcement in this matter would run counter to the policy of "discouraging [D]efendants' tactic of delaying their venue motion until the [sic] after the [c]ourt has invested its case management resources and discovery is complete." *Id.* (internal citations omitted). Hoffer also argued that "New Jersey has a strong interest in vindicating the rights of New Jersey residents such as Hoffer who are victims of fraud perpetrated by out-of-state defendants." *Id.* Again, it appears the arguments put forth by Hoffer are without merit.

The conclusory assertion of Hoffer that enforcement of the Forum Selection Clause would frustrate the public policy of discouraging defendants from delaying a venue motion until after a court has invested its case management resources and discovery is simply unfounded. For example, Hoffer failed to provide any factual support for this general proposition. Indeed, it is unclear how such a policy could be implicated, much more frustrated, given the present posture of this matter.

As the Defendants correctly observe, they have been neither dilatory or misleading in filing the Motion to Transfer. *See* Reply Brief at 8. As mentioned, the Defendants timely filed the Answer/Counterclaims in response to the Complaint on 31 January 2000. Seventeen days after Hoffer served his Answer and Responses to interrogatories, moreover, the Defendants served Hoffer with their moving papers in support of the Motion to Transfer (just three months after filing the Answer/Counterclaims). *Six weeks later,* Hoffer responded by serving on the Defendants his opposition to the Motion to Transfer.

In addition, the reliance, by Hoffer, on a single citation to an unreported case from the United States District Court for the District of Delaware is unpersuasive. *See* Opp. Brief at 23 (citing *Mobilificio San Giacomo S.p.A. v. Stoffi, et al.,* 1998 WL 125534 (D.De.29 Jan.1998)). In denying a motion to dismiss based on a *newly presented* forum selection clause argument, the court observed that "the defendants did not diligently press their forum selection clause position." *Id.* at *6. "Rather, they waited eight months into the litigation.... By this point in time, defendants had filed four motions to dismiss, participated in extensive discovery, and sought a preliminary injunction. As a result, both the parties and the court have invested substantial resources and time in this action." *Id.*

By contrast, in the instant matter the Motion to Transfer was the first significant motion filed by the Defendants. Furthermore, the Motion to Transfer was promptly served on Hoffer. Accordingly, *Giacomo* is factually inapposite to the instant matter.

Hoffer further argued that "New Jersey has a strong interest in vindicating the rights of New Jersey residents such as Hoffer who are victims of fraud perpetrated by out-of-state defendants." Opp. Brief at 24. This argument, however, does not fit the facts of this litigation. As mentioned, Hoffer "negotiated" the ultimate terms of his employment agreement in Redmond, Washington. He signed the 25 June 1996 Employment Agreement and the NDA at Infospace headquarters located in Redmond, Washington. In addition, the primary issue in dispute—whether Infospace breached the 25 June 1996 Employment Agreement—is centered on events which occurred *exclusively* in Redmond, Washington. In addition, this Circuit has observed that any deference afforded the choice of forum of a plaintiff "is inappropriate where the plaintiff has already freely contractually chosen an appropriate venue." *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 880 (3d Cir.1995). The arguments presented by Hoffer concerning public policy, therefore, lack any basis in fact.

### 3. *"Seriously" Inconvenient Forum*

Hoffer argued that enforcement of the Forum Selection Clause "would be unreasonable and seriously inconvenient such that [he] 'would be effectively deprived of [his] day in court.'" [6] Opp. Brief at 24 (quoting *Danka Funding,* 21 F.Supp.2d. at 470–473). In support of this argument, Hoffer stated that "most of [his] key witnesses ... have agreed to appear at trial in New Jersey but not in Washington." *Id.* at 25.

Although Hoffer argued that his "key witnesses" are New Jersey residents, subject only to the subpoena power of New Jersey, and that some witnesses have

---

**6.** It does not appear that the Western District of Washington is a "seriously inconvenient" forum for Hoffer himself. It is undisputed Hoffer traveled to Washington to negotiate the terms of his employment contract with Jain. *See* Complaint, ¶ 17. Hoffer also traveled to Washington on at least on other occasion for business related to Infospace. *See* A. Jain Aff., ¶ 6. In addition, Hoffer stated in an e-mail transmission to Jain that he was considering relocating to Washington as a result of his future employment with Infospace. *See* 13 June 1996 e-mail transmission, attached as Ex. A to the Jain Aff.

agreed to "appear at trial in New Jersey but not in Washington," *id.*, Hoffer has failed to submit the requisite affidavits concerning the testimony of these purported "key witnesses." *See Van Cauwenberghe v. Biard*, 486 U.S. 517, 529, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988) (stating that inquiry of court concerning interests of parties in a transfer motion should be based on a review of affidavits); *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 44 (3d Cir.1988) (same); *Tischio v. Bontex, Inc.*, 16 F.Supp.2d 511, 520 (D.N.J.1998) (same); *Rappoport v. Steven Spielberg, Inc.*, 16 F.Supp.2d. 481, 499 (D.N.J.1998) (same); *Ricoh Co. Ltd. v. Honeywell, Inc.*, 817 F.Supp. 473, 480 (D.N.J.1993) (same).

Hoffer did submit affidavits concerning the "availability," or apparent lack thereof, of two witnesses, namely Kay and Kent Plunkett ("Plunkett"). *See* Kay Aff.; Plunkett Aff. These affidavits, however, provide little, if any, support for the "serious inconvenience" argument asserted by Hoffer. In addition, the statements contained therein appear to be nonsensical.

For example, it appears Kay resides in Santa Clara County, California. *see* Kay Aff., ¶¶ 1–2. Kay stated: "I frequently travel to the Newark/New York City area for business purposes. It would cause little disruption to my schedule to appear at the trial in Newark, New Jersey...." *Id.* Kay, a west coast resident however, also stated: "In the event that the venue of this action is transferred to Seattle, Washington, I would be extremely inconvenient [sic] for me to appear at the trial, due to the length of the trip involved...." *Id.*, ¶ 3. Irrespective of the facts that Kay is a former Infospace employee who has previously visited Infospace headquarters in Redmond, Washington and that he is the brother-in-law of Hoffer, *see* Kay Dep. at 68:15–20; 80:6–7, these statements concerning inconvenience defy logic. Furthermore, neither Kay nor Hoffer even attempt to (nor does it appear they could) reconcile the bizarre assertion that Kay, a California resident, would be more inconvenienced by traveling to Washington State than to New Jersey.

Plunkett is also a former Infospace employee who currently resides in Boston, Massachusetts. *See* Plunkett Aff., ¶ 1. Plunkett stated: "Although I am a resident of Boston, Massachusetts, it is my intention to appear voluntarily as a witness at the trial in Newark...." *Id.*, ¶ 2. Plunkett also stated that he is "unwilling" to appear in Washington. *Id.*, ¶ 3. It appears Plunkett is beyond the limits of the subpoena power of the courts located in either New Jersey or Washington.

Because the affidavit of Plunkett does not indicate, or describe, the relevancy of this "key witness's" testimony, it is unclear whether his apparent refusal to appear at trial in Washington would deprive Hoffer of his day in court. Indeed, at his deposition, Plunkett testified that he never met Hoffer prior to the institution of an unrelated lawsuit. *See* Plunkett Dep. at 18:1–9 (Q: "Did you have an occasion to meet [ ] Hoffer, along with ... Jain at any time?" Plunkett: "No. I've—I think I might have had a conversation with him where there were many people on a conference call, but other than that, I had never spoken with [ ] Hoffer and had never met him, actually, until his deposition in my case, it was the first time I ever shook his hand.").

Hoffer, therefore, has failed to demonstrate how the enforcement of the Forum Selection Clause in the instant matter would prove to be "unreasonable and seriously inconvenient such that '[he] would be effectively deprived of [his] day in court.'" Opp. Brief at 24 (quoting *Danka Funding*, 21 F.Supp.2d at 470–473).

As discussed above, a forum selection clause is "prima facie valid and should be enforced." *See M/S Bremen*, 407 U.S. at 10, 92 S.Ct. 1907; *Danka Funding*, 21 F.Supp.2d at 470. It appears Hoffer has failed to meet his burden because he has not proved that enforcement of the Forum Selection Clause would be "unreasonable

under the circumstances."[7] *See id.* Pursuant to the valid Forum Selection Clause in the NDA, therefore, venue is only "properly laid in King county, Washington or in the Federal District Court of the Western District of Washington." NDA, ¶ 14, attached as Ex. B to the A. Jain Aff.

### B. *Improper Venue/Transfer Pursuant to 28 U.S.C. § 1406(a)*

The venue in which a defendant may be sued in Federal court is restricted by statute. As mentioned, the instant action is brought pursuant to diversity jurisdiction, 28 U.S.C. § 1332. *See* Complaint, ¶ 2. In diversity actions, venue is governed by 28 U.S.C. § 1391(a) ("Section 1391(a)"). Section 1391(a) provides:

> (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). For purposes of Section 1391(a), "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." *See* 28 U.S.C. § 1391(c). *See also Jumara,* 55 F.3d at 879; *Doran v. Credit Bureau Associates,* 2000 WL 288326, at *2 (E.D.Pa.17 March 2000).

■ In Federal court, venue questions are governed, in part, by 28 U.S.C. § 1406 ("Section 1406"). Section 1406 provides for the transfer (in the interest of justice) or dismissal of a case laying venue in the wrong division or District. *See* 28 U.S.C. § 1406(a). *See also Carteret Savings Bank v. Shushan,* 919 F.2d 225, 227 (3d Cir. 1990). "In determining where a substantial part of the events or omissions giving rise to a claim arises for purposes of Section 1391, three factors are relevant: (1) the place of injury; (2) the 'weight of contacts;' and (3) whether a substantial part of the events or omissions giving rise to the claim occurred in the [D]istrict." *Tischio,* 16 F.Supp.2d at 516 (citing *Eason v. Linden Avionics, Inc.,* 706 F.Supp. 311, 329 (D.N.J.1989)).

■ In opposition to the Motion to Transfer, Hoffer argued that "a substantial number of events and omission giving rise to [his] claims occurred in New Jersey." Opp. Brief at 27. In an attempt to defeat the overwhelming number of contacts with the Western District of Washington in the instant matter, Hoffer argued, in part: "The fact that the employment agreement was signed in Washington is a single event in an ongoing course of fraudulent conduct that primari-

---

7. In addition to the arguments address above, Hoffer also argued that the instant litigation is not governed by the Forum Selection Clause contained in the NDA because the issues presented only concern the 25 June 1996 Employment Agreement, a document Hoffer contended is wholly separate from, and independent of, the NDA. *See* Opp. Brief at 18–21.

Upon review of the pleadings, papers and documents filed with the court and submitted in support of the Motion to Transfer, it appears this argument is without merit. For example, the deposition testimony of Hoffer reveals that both the 25 June 1996 Employment Agreement and the NDA were signed virtually simultaneously while Hoffer was at Infospace headquarters in Redmond, Washington. *See e.g.* Hoffer Dep. at 15:3–7, 17–25. Hoffer, moreover, described his employment agreement with Infospace as being comprised of both the 25 June 1996 Employment Agreement and the NDA. *See* Answers and Responses at Answer No. 2–4, 15, attached as Ex. B to the Snyder Aff. In sum, not only is it nonsensical to argue that an employee non-disclosure agreement derives meaning from itself and is wholly independent of an employment agreement, it is disingenuous in the instant matter based on the facts presented.

ly occurred in New Jersey or by telephone and e-mail communications to Hoffer in New Jersey." *Id.* at 29. Hoffer, however, has failed to provide the court with any tangible evidence (deposition testimony and, or, affidavits or otherwise) supporting these assertions.

Despite the tortured spin Hoffer places on the instant matter, it appears venue was improperly laid in this District. *See* 28 U.S.C. § 1391(a). By contrast, venue is proper in the Western District of Washington. As discussed in detail above, the driving issue in this litigation is the alleged breach of the 25 June 1996 Employment Agreement by the Defendants. Indeed, the substantial events, if not all of the events, giving rise to the primary claim, and the other claims, arising out of this matter transpired in Redmond, Washington.

For example, contrary to the arguments of Hoffer, the central negotiations concerning the terms of his employment with Infospace took place at Infospace headquarters in Redmond, Washington. *See* Complaint, ¶¶ 17–18; Hoffer Dep. at 14:16–19, attached as Ex. B to the McMillan Aff. It is undisputed that the 25 June 1996 Employment Agreement and the NDA were executed in Redmond, Washington. *See id.* In addition, the alleged breach and decision to terminate Hoffer and deny his exercise of stock options occurred in Redmond, Washington. *See* Complaint, ¶ 18; Hoffer Dep. at 18:6–12, attached as Ex. A to the Snyder Aff. Jain, moreover, resides in Washington. *See id.,* ¶ 4. Infospace, likewise has its principal place of business in Redmond, Washington and importantly, does not maintain any offices in New Jersey. *See id.,* ¶ 5. Furthermore, Hoffer made at least two separate trips to Washington in connection with his employment with Infospace. *See* Hoffer Corporate Amex Bill, attached as Ex. C to the A. Jain Aff.

Accordingly, upon review of the relevant facts regarding the determination of whether venue is appropriately laid, it appears that the overwhelming contacts and events giving rise to this litigation occurred in the Western District of Washington. *See Carteret Savings Bank,* 919 F.2d at 227; *Tischio,* 16 F.Supp.2d at 516. The instant matter, therefore, is also appropriately transferred, pursuant to Section 1406(a), to the United States District Court for the Western District of Washington. *See* 28 U.S.C. § 1406(a).

## C. Transfer Pursuant to 28 U.S.C. § 1404(a)

■ The Defendants argued that assuming arguendo that Hoffer could establish that this District is a proper venue for the instant matter, "this action should be transferred to the United States District Court for the Western District of Washington pursuant to 28 U.S.C. § 1404(a) [('Section 1404(a)')]." Moving Brief at 21. *See also* Reply Brief at 13–15.

By contrast, Hoffer argued the his "choice of a New Jersey forum is ... entitled to deference and is presumptively correct." Opp. Brief at 33. Again, Hoffer also argued that "the parties respective claims substantially arose from events and omissions that occurred in New Jersey." *Id.* at 33, 39. In addition, Hoffer argued that a majority of witnesses are only available in New Jersey. *See id.* at 37. Finally, Hoffer argued that the relevant documents in this case are not voluminous and that they fit "neatly within a single redwell." *Id.* at 38. As mentioned, Hoffer did not submit affidavits concerning the relevant factors pertaining to a transfer motion.

### 1. Standard of Review under Section 1404(a)

Section 1404(a) authorizes a District Court to transfer a case to any other district where venue is proper "[f]or the convenience of the parties and witnesses, in the interests of justice...." 28 U.S.C.

§ 1404(a).[8] The purpose of Section 1404(a) is to avoid the waste of time, energy and money and, in addition, to safeguard litigants, witnesses and the public against avoidable inconvenience and expense. *See Lexecon Inc., et al. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 33, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998); *Jumara,* 55 F.3d at 879; *In re Emerson Radio Corp.,* 52 F.3d 50, 55 (3d Cir.1995); *SmithKline Beecham Corp. v. Geneva Pharmaceuticals, Inc.,* 2000 WL 217642 at 1 (E.D.Pa.11 Feb.2000); *Westcode, Inc. v. RBE Electronics, Inc.,* 2000 WL 124566 at 7 (E.D.Pa. Feb.2, 2000); *Ricoh Co. Ltd. v. Honeywell, Inc.,* 817 F.Supp. 473 (D.N.J.1993); *American Tel. & Tel. Co. v. MCI Communications Corp.,* 736 F.Supp. 1294, 1305 (D.N.J.1990).

■ There are three factors to consider when determining whether to transfer a matter—(1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice. *See* 28 U.S.C. § 1404(a); *Jumara,* 55 F.3d at 879; *Geneva Pharmaceuticals, Inc.,* 2000 WL 217642, at *1; *Larami Ltd. v. Yes Entertainment Corp.,* 244 B.R. 56, 60–61 (D.N.J. 2000); *RBE Electronics,* 2000 WL 124566 at 7; *Hudson United Bank v. Chase Manhattan Bank of Conn., NA,* 832 F.Supp. 881, 887 (D.N.J.1993), *aff'd,* 43 F.3d 843 (3d Cir.1994); *Honeywell,* 817 F.Supp. at 479. The transfer analysis is not limited, however, to these factors.

■ The decision to transfer must incorporate "all relevant factors to determine whether on balance the litigation [will] more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Geneva Pharmaceuticals, Inc.,* 2000 WL 217642, at *1 (quoting *Jumara,* 55 F.3d at 879) (citation omitted); *Yes! Entertainment,* 244 B.R. at 60–61; *Tischio,* 16 F.Supp.2d at 519; *Rappoport v. Steven Spielberg, Inc.,* 16 F.Supp.2d 481, 498 (D.N.J.1998); *Hudson United Bank,* 832 F.Supp. at 888.

As mentioned, the alternative forum proposed by the Defendants in the instant action is the Western District of Washington. *See* Moving Brief at 21–31; Reply Brief at 13–15. As a preliminary matter, it must be determined whether the proposed transferee venue is one in which the case "might have been brought." *See* 28 U.S.C. § 1404(a); *Jumara,* 55 F.3d at 879; *In re Emerson Radio Corp.,* 52 F.3d at 55; *RBE Electronics,* 2000 WL 124566 at 7; *AT & T,* 736 F.Supp. at 1305.

a. *The Instant Matter Could Have Been Brought In The Western District Of Washington*

As discussed, it appears the Western District of Washington is a proper venue for the instant matter. For example, the central negotiations concerning the terms of the employment of Hoffer by Infospace took place at Infospace headquarters in Redmond, Washington. *See* Complaint, ¶¶ 17–18; Hoffer Dep. at 14:16–19, attached as Ex. B to the McMillan Aff. It is undisputed that the 25 June 1996 Employment Agreement and the NDA were executed in Redmond, Washington. *See id.* In addition, the alleged breach and decision to terminate Hoffer and deny his exercise of stock options occurred in Redmond, Washington. *See* Complaint, ¶ 18; Hoffer Dep. at 18:6–12, attached as Ex. A to the Snyder Aff. Jain, moreover, resides in Washington. *See id.,* ¶ 4. Infospace, likewise has its principal place of business in Redmond, Washington and importantly, does not maintain any offices in New Jersey. *See id.,* ¶ 5. Furthermore, Hoffer made at least two separate trips to Washington in connection with his employment with Infospace. *See* Hoffer Corporate Amex Bill, attached as Ex. C to the A. Jain Aff.

---

**8.** Section 1404(a) provides:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.
28 U.S.C. § 1404(a).

In addition, because it appears the Forum Selection Clause is valid, *see* Section A, *supra*, the Forum Selection Clause is entitled to *"substantial consideration* [in the Section 1404(a) analysis] and makes deference to plaintiff's choice of forum inappropriate." *Jumara*, 55 F.3d at 880 (emphasis added).

Based upon the foregoing, it appears pursuant to Section 1391(a)(1) and Section 1391(a)(2) the instant action "might have been brought" in the proposed transferee forum, the Western District of Washington. *See* 28 U.S.C. § 1404(a).

A defendant seeking a transfer must also establish that an adequate alternative forum exists for the dispute. *See Williams v. Monroe Emergency Physicians, P.C.*, 1999 WL 124398, at *1 (E.D.Pa.10 Feb.1999) (citing *Lacey v. Cessna Aircraft Company*, 862 F.2d 38, 43 (3d Cir.1988)) (hereinafter *"Lacey I"*); *O'Laughlin v. Consolidated Rail Corp.*, 1999 WL 124393, at *1 (E.D.Pa. 9 Feb. 1999) (same); *Tischio*, 16 F.Supp.2d at 519. "Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction," unless "the remedy offered by the other forum is clearly unsatisfactory." *Bhatnagar v. Surrendra Overseas Ltd., et al.*, 52 F.3d 1220, 1227 (3d Cir.1995) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n. 22, 102 S.Ct. 252, 70 L.Ed.2d 419, *reh'g denied*, 455 U.S. 928, 102 S.Ct. 1296, 71 L.Ed.2d 474 (1982)).

As mentioned, Jain is a citizen and resident of Washington State and Infospace is a corporation with its principal place of business located in Redmond, Washington. *See* Complaint, ¶¶ 4–5. The Defendants, therefore, are amenable to process in Washington. *See* 28 U.S.C. § 1391(a)(1), (c). Because the proposed forum offers a satisfactory remedy for the parties, the Western District of Washington is an adequate alternative forum. *See Bhatnagar*, 52 F.3d at 1227.

### b. *Private and Public Interests*

Transfer analysis under Section 1404(a) is a flexible and individualized analysis and must be made on the unique facts presented in each case. *See Piper*, 454 U.S. at 249–250, 102 S.Ct. 252; *RBE Electronics*, 2000 WL 124566, at *7 (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29–30, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); *Lacey I*, 862 F.2d at 43; *Tischio*, 16 F.Supp.2d at 511. A determination that transfer to another jurisdiction is appropriate represents an " 'exercise[ ] of structured discretion by trial judges appraising the practical inconveniences posed to the litigants and the court should a particular action be litigated in one forum rather than another.' " *Lawrence v. Xerox Corp.*, 56 F.Supp.2d 442, 449 (D.N.J.1999) (quoting *Honeywell*, 817 F.Supp. at 479) (quoting *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 632 (3d Cir.1989) (hereinafter *"Lony I"*)). There is no rigid rule governing the determination by a court; " '[e]ach case turns on its facts.' " *Lacey I.*, 862 F.2d at 43 (quoting *Piper*, 454 U.S. at 255–56, 102 S.Ct. 252); *Tischio*, 16 F.Supp.2d at 519; · *Rappoport*, 16 F.Supp.2d at 498. Added to these factors are the "interests of justice" and the impact on judicial administration of maintaining related actions in separate fora. *See Jumara*, 55 F.3d at 879; *Tischio*, 16 F.Supp.2d at 519; *Rappoport*, 16 F.Supp.2d at 498; *Honeywell*, 817 F.Supp. at 479.

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), the Court listed various factors which should be considered when deciding if a certain action should be transferred.[9] These fac-

---

**9.** *Gulf Oil* involved a motion to dismiss under the doctrine of *forum non conveniens*. Courts routinely look to the Gulf Oil factors for guidance on Section 1404(a) motions. *See Xerox*, 56 F.Supp.2d at 450; *NCR Credit Corp. v. Ye* *Seekers Horizon, Inc.*, 17 F.Supp.2d 317, 320 (D.N.J.1998); *Tischio*, 16 F.Supp.2d at 519 n. 9; *Honeywell*, 817 F.Supp. at 479 n. 16. As well, Third Circuit decisions such as *Lony I*, *Lony v. E.I. DuPont de Nemours & Co.*, 935

tors fall into two broad categories. The first category includes factors relating to the "private interests" of the parties in the context of the litigation. The types of private interests may include the choice of forum of the plaintiff, the ease of access to sources of proof, availability of compulsory process over unwilling witnesses, the cost of attendance of willing witnesses, obstacles to a fair trial and the possibility of a jury view of the premises. *See Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839; *Geneva Pharmaceuticals, Inc.,* 2000 WL 217642, at *1; *Smithkline Beecham Corp. v. Apotex Corp., Apotex, Inc.,* 2000 WL 15074, at *2 (E.D.Pa. 4 Jan. 2000); *Harbuck v. Aramco, Inc., et al.,* 1999 WL 999431, at *8 (E.D.Pa.21 Oct.1999). Other private interests may include the preference of the defendant, whether the claim arose elsewhere, and the location of books and records. *See Jumara,* 55 F.3d at 879.

The second category consists of the "public interest" in the administration of courts and the adjudication of cases. Public interests include court congestion and other administrative difficulties, placing the burden of jury duty on those having the closest ties to the action, the local interest in having a matter adjudicated at home and the familiarity of the forum court with the applicable law. *See Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. 839 *Jumara,* 55 F.3d at 879; *Geneva Pharmaceuticals, Inc.,* 2000 WL 217642, at *1; *Apotex,* 2000 WL 15074, at *2; *Aramco,* 1999 WL 999431, at *8; *Tischio,* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 498–99; *Honeywell,* 817 F.Supp. at 480; *AT & T,* 736 F.Supp. at 1307.

The moving party has the burden of persuasion on a motion to transfer. *See Jumara,* 55 F.3d at 879; *Lony II,* 935 F.2d at 609; *Lony I,* 886 F.2d at 633; *Lacey I,* 862 F.2d at 44; *Geneva Pharmaceuticals, Inc.,* 2000 WL 217642, at *1; *Yes! Entertainment,* 244 B.R. at 61; *Apotex,* 2000 WL 15074, at *2; *Tischio,* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499; *Tranor v. Brown,* 913 F.Supp. 388, 391 (E.D.Pa.1996); *Honeywell,* 817 F.Supp. at 480. The burden is not on the plaintiff to show the proposed alternative forum is inadequate. *See Lacey I,* 862 F.2d at 44; *Xerox,* 56 F.Supp.2d at 451; *Tischio,* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499; *Honeywell,* 817 F.Supp. at 480. Rather, the burden is on the moving party to show the proposed alternative forum is not only adequate, but also more appropriate than the present forum. *See Jumara,* 55 F.3d at 879; *Lacey I,* 862 F.2d at 43–44; *Xerox,* 56 F.Supp.2d at 451; *Tischio,* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499; *Honeywell,* 817 F.Supp. at 480.

In making its determination, a " '[D]istrict [C]ourt is required to develop adequate facts to support its decision and to articulate specific reasons for its conclusion that transfer to another venue is appropriate.' " *Xerox,* 56 F.Supp.2d at 451 (quoting *Tischio,* 16 F.Supp.2d at 520 (quoting *Lacey I,* 862 F.2d at 39)). *See also Hudson United Bank,* 832 F.Supp. at 888; *Honeywell,* 817 F.Supp. at 480. The moving party must submit sufficient information in the record to facilitate the appropriate analysis and to meet its burden of persuasion. *See Xerox,* 56 F.Supp.2d at

F.2d 604, 609 (3d Cir.1991) (hereinafter "*Lony II*") and *Lacey I,* which involve motions to dismiss under the doctrine of *forum non conveniens,* are relevant to a motion to transfer under Section 1404(a).

District Courts have broader discretion to transfer an action under Section 1404(a), than to dismiss under the common law doctrine of *forum non conveniens. See Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544,

99 L.Ed. 789 (1955); *Joint Stock Soc. Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court v. Heublein, Inc.,* 936 F.Supp. 177, 191 (D.Del.1996) (citation omitted); *Ruccolo v. BDP, Int'l, Inc.,* No. 95–2300, 1996 WL 735575, at 17 & n. 9 (D.N.J. 25 Mar. 1996); *cf. Lacey v. Cessna Aircraft Co.,* 932 F.2d 170 (3d Cir.), *reh'g denied en banc* (3d Cir.1991) ("*Lacey II*"), *Mediterranean Golf, Inc. v. Hirsh,* 783 F.Supp. 835, 840–41 (D.N.J.1991).

451; *Honeywell,* 817 F.Supp. at 480. *See also Piper,* 454 U.S. at 258, 102 S.Ct. 252; *Rappoport,* 16 F.Supp.2d at 499. This inquiry does not, however, necessarily require extensive investigation. *See Van Cauwenberghe v. Biard,* 486 U.S. 517, 529, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1988); *Xerox,* 56 F.Supp.2d at 451; *Tischio* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499.

■ The inquiry into the interests of the parties may be resolved by an examination of the affidavits submitted by the parties. *See Van Cauwenberghe,* 486 U.S. at 529, 108 S.Ct. 1945; *Lacey I,* 862 F.2d at 44; *Tischio* 16 F.Supp.2d at 520; *Rappoport,* 16 F.Supp.2d at 499; *Honeywell,* 817 F.Supp. at 480. From that basis, the contentions of the parties and the relevant private and public interests must be considered and balanced. *See Xerox,* 56 F.Supp.2d at 451; *Lacey I,* 862 F.2d at 45; *Tischio,* 16 F.Supp.2d at 520; *Hudson United Bank,* 832 F.Supp. at 888. As mentioned, in support of the Motion to Transfer, the Defendants submitted four affidavits concerning central events giving rise to this litigation and the relevant evidence and documents relevant to the resolution of this matter. *See* A. Jain Aff.; Snyder Aff.; McMillan Aff. and the N. Jain Aff. As also discussed, *see* Section A, Hoffer submitted two affidavits in opposition to the instant matter. *See* Kay Aff.; Plunkett Aff.

### 1. *The Private Interests*

The primary private interests in the instant action are the choice of forum by the parties and the convenience of the available districts with regard to sources of proof, namely, the witnesses and documentary evidence.

#### a. *Choice of Forum*

■ In this Circuit, the choice of forum by a plaintiff is a "paramount concern" in deciding a Section 1404(a) motion to transfer venue. *See Lony I,* 886 F.2d at 633; *Lacey I,* 862 F.2d at 45–46; *Shutte v.* *Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971); *Xerox* 56 F.Supp.2d at 452; *Danka Funding,* 21 F.Supp.2d at 474–75; *Tischio,* 16 F.Supp.2d at 521 (quoting *Honeywell,* 817 F.Supp. at 480); *Rappoport,* 16 F.Supp.2d at 499. *See also Shore Slurry Seal, Inc. v. CMI Corp.,* 964 F.Supp. 152, 156 (D.N.J. 1997) (stating choice of proper forum by plaintiff is "paramount consideration" in transfer analysis); *Newcomb v. Daniels, Saltz, Mongeluzzi & Barrett, Ltd.,* 847 F.Supp. 1244, 1246 (D.N.J.1994) (stating choice of forum by plaintiff is accorded "significant weight"). The choice of forum is "entitled to greater deference" when a plaintiff chooses his home forum. *See Xerox,* 56 F.Supp.2d at 452 (quoting *Tischio,* 16 F.Supp.2d at 521 (quoting *Honeywell,* 817 F.Supp. at 480)). *See also Piper,* 454 U.S. at 255–56, 102 S.Ct. 252; *Lony I,* 886 F.2d at 633–34; *Lacey I,* 862 F.2d at 45; *Rappoport,* 16 F.Supp.2d at 499.

Indeed, "unless the balance is strongly tipped in favor of the defendant, the plaintiff's choice of forum should not be disturbed." *Xerox,* 56 F.Supp.2d at 452; *Honeywell,* 817 F.Supp. at 480. *See also Lony II,* 935 F.2d at 609; *Lacey I,* 862 F.2d at 44. If otherwise correct, the choice of forum by a plaintiff is considered to be presumptively correct. *See Lacey I,* 862 F.2d at 45; *Xerox,* 56 F.Supp.2d at 452; *Tischio,* 16 F.Supp.2d at 521; *Rappoport,* 16 F.Supp.2d at 499; *Hudson United Bank,* 832 F.Supp. at 888; *Honeywell,* 817 F.Supp. at 480; *Mediterranean Golf,* 783 F.Supp. at 842. This presumption, however, is not dispositive. *See Xerox,* 56 F.Supp.2d at 452, n. 6 (quoting *Tischio,* 16 F.Supp.2d at 521). *See also Lony I,* 886 F.2d at 634; *Lacey I,* 862 F.2d at 45–46; *AT & T,* 736 F.Supp. at 1306.

The choice of forum by a plaintiff is simply a preference; it is not a right. *See Xerox,* 56 F.Supp.2d at 452, n. 6; *Tischio,* 16 F.Supp.2d at 521; *Honeywell,* 817 F.Supp. at 480; *AT & T,* 736 F.Supp. at 1306. The choice of forum is not the only

factor to be considered in a Section 1404(a) transfer analysis. *See Jumara,* 55 F.3d at 880 (considering other factors); *Lony I,* 886 F.2d at 634; *Xerox,* 56 F.Supp.2d at 452, n. 6; *Honeywell,* 817 F.Supp. at 480; *AT & T,* 736 F.Supp. at 1306. Indeed, in certain circumstances, the choice of forum by a plaintiff is afforded less weight. *See Xerox,* 56 F.Supp.2d at 452, n. 6.

"Within this framework, a forum selection clause is treated as a manifestation of the parties' preference as to a convenient forum. Hence, within the framework of [Section] 1404, Congress encompasse[d] consideration of the parties' private expression of their venue preferences." *Jumara,* 55 F.3d at 880 (citing *Stewart,* 487 U.S. at 29–30, 108 S.Ct. 2239).

As mentioned, "[a]lthough the parties' agreement as to the most proper forum should not receive dispositive weight, it is entitled to substantial consideration." *Id.* (citations omitted). "Thus, while courts normally defer to a plaintiff's choice of forum, such deference is inappropriate where the plaintiff has already freely contractually chosen an appropriate venue." *Id.* As a result, the Circuit has determined that "[w]here the forum selection clause is valid ... the plaintiffs bear the burden of demonstrating why they should not be bound by their contractual choice of forum." *Id. Cf. Danka Funding,* 21 F.Supp.2d at 475 (indicating that "plaintiff's choice, however, is entitled to less deference where the operative facts of a lawsuit occurred outside the forum selected by plaintiff."); *Tischio,* 16 F.Supp.2d at 521 (stating that deference is curbed where "the choice of forum ... has little connection with the operative facts of the lawsuit."); *Newcomb,* 847 F.Supp. at 1246; *Honeywell,* 817 F.Supp. at 481 (stating "[w]hen the central facts of a lawsuit occur outside the forum state, a plaintiff's selec-

tion of that forum is entitled to less deference."). *See also National Micrographics Sys.,* 825 F.Supp. at 681; *AT & T,* 736 F.Supp. at 1306.

As mentioned, Hoffer argued that he "is and at all times relevant to this action has been a New Jersey resident. [His] choice of a New Jersey forum is therefore entitled to deference and is presumptively correct." Opp. Brief at 32–33. In support of this argument, Hoffer again stated that the Forum Selection Clause does not affect the instant matter because the claims arise out of an alleged breach of the 25 June 1996 Employment Agreement and, therefore, are separate and apart from the NDA and the Forum Selection·Clause contained therein. *See id.* at 33.

As discussed in detail above, *see* Section A, the Forum Selection clause not only is valid and, therefore, enforceable, but it also governs the instant matter because the 25 June 1996 Employment Agreement and the NDA, together, comprise the terms of employment agreed to by Hoffer and the Defendants. *See eg.* Hoffer Dep. at 15:3–7, 17–25, attached as Ex. B to the McMillan Aff.; Answers and Responses at Answer No. 2–4, 15, attached as Ex. B to the Snyder Aff. Because the Forum Selection Clause in the instant matter is valid and enforceable, the presumption of validity and, or, deference normally afforded to the choice of forum of a plaintiff, therefore, is "inappropriate."[10] *See Jumara,* 55 F.3d at 873.

b. *Access to Proof*

The second relevant factor under the private interest analysis is the convenience of the available districts concerning the witnesses and the documentary evidence of

---

**10.** Even assuming arguendo that the Forum Selection Clause either did not exist or is not enforceable, because the Defendants have thoroughly established the operative facts for the Section 1404(a) analysis arose in Washington, *see* Section A, B *supra,* the choice of forum by Hoffer would be afforded less deference. *See Lony I,* 886 F.2d at 634; *Danka Funding,* 21 F.Supp.2d at 475; *Tischio,* 16 F.Supp.2d at 521; *Honeywell,* 817 F.Supp. at 481.

both parties.[11]  As the Supreme Court has stated:

> To examine 'the relative ease of access to sources of proof' and the availability of witnesses, the [D]istrict [C]ourt must scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of the evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action.

*Van Cauwenberghe,* 486 U.S. at 528, 108 S.Ct. 1945 (quoting *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839).  *See Xerox,* 56 F.Supp.2d at 449.

This litigation primarily involves claims for breach of contract and misappropriation of trade secrets. *See* Complaint; Answer/Counterclaims.  The issues relating to the alleged breach of the employment agreement between Hoffer and the Defendants and the counterclaim of alleged misappropriation of trade secrets necessarily require analysis of facts, documents and testimony concerning the purpose, implementation and effect of both the 26 June 1996 Employment Agreement and the NDA. As demonstrated by the factually specific declarations submitted by the Defendants, the development of these facts is more easily undertaken in Washington than in New Jersey.

*Location of the Relevant Documents*

As mentioned, the "relative ease of access to sources of proof" is another private interest District Courts may consider when evaluating a motion to transfer.  *See*

11.  Neither Hoffer nor the Defendants submitted factually specific affidavits concerning the convenience of the parties and, or, witnesses. In the instant matter, however, the absence of affidavits concerning these issue does not present a shortcoming in the Motion to Transfer in light of the alternative, and exceedingly overwhelming, circumstances favoring transfer to the Western District of Washington; not to mention it is Hoffer, not the Defendants, who bears the burden of persuasion in a Section 1404(a) transfer motion premised on a valid and enforceable forum selection clause. *See Jumara,* 55 F.3d 873. ("Where the forum

*Van Cauwenberghe,* 486 U.S. at 528, 108 S.Ct. 1945 (quoting *Gulf Oil,* 330 U.S. at 508, 67 S.Ct. 839); *Xerox,* 56 F.Supp.2d at 449–452.

In contrast to the assertion of Hoffer that the instant action involves a small amount of documents, *see* Opp. Brief at 37–38, it appears access to documents favors transfer to the Western District of Washington.  Indeed, upon review of "Plaintiff's First Request for the Production of Documents" (the "Hoffer Request for Documents"), it appears the litigation of the instant matter will necessary include a voluminous amount of documents.  *See* Hoffer Request for Documents, attached as Ex. C to the Snyder Aff. For example, such documents include all communications, proposals, contracts and business agreements pertaining to various Infospace clients. *See id.*  In addition, Hoffer has requested various telephone records and all pleadings, briefs, orders, transcripts and documents produced in three previous lawsuits filed against Infospace. *See id.*  As mentioned, Infospace has its principal place of business in Redmond, Washington, *see* N. Jain Aff., ¶ 1. It does not maintain any offices in New Jersey. Location of the relevant documents in the instant matter, therefore, favors transfer of this litigation to the Western District of Washington. *See Tischio,* 16 F.Supp2d. at 525–26.

### 2.  *Public Interests*

The public interest factors relevant to a determination of the propriety of transfer include

selection clause is valid ... the plaintiffs bear the burden of demonstrating why they should not be bound by their contractual choice of forum.").

As discussed above, *see* Section A, Hoffer submitted two affidavits in support of his opposition to the Motion to Transfer.  Importantly, these affidavits fail to enlighten as to the relevancy of the testimony of the affiants. *See* Kay Aff.; Plunkett Aff. Furthermore, neither affidavit appears to be compelling concerning the issue of availability for trial. *See id.*

the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having a trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems and conflicts of laws or the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Lony I*, 886 F.2d at 640 (quoting *Piper*, 454 U.S. at 241 n. 6, 102 S.Ct. 252). Evaluation of the public interest factors include consideration of "the locus of the alleged culpable conduct ... and the connection of the conduct to plaintiff's chosen forum." *Lacey I*, 862 F.2d at 48 (quoting *Van Cauwenberghe*, 486 U.S. at 529, 108 S.Ct. 1945). *See also Lony II* 935 F.2d at 612. As discussed below, it appears Washington has a greater interest in this litigation than New Jersey.

### a. *Local Interests*

As discussed in detail above, *see* Section A, B, it appears the "locus of culpable conduct" occurred predominately in Washington. Furthermore, it is undisputed that the 25 June 1996 Employment Agreement and the NDA were negotiated and executed in Redmond, Washington. *See id.* In addition, the alleged breach and decision to terminate Hoffer and deny his exercise of stock options occurred in Redmond, Washington. *See* Complaint, ¶ 18; Hoffer Dep. at 18:6–12, attached as Ex. A to the Snyder Aff. Jain, moreover, resides in Washington. *See id.*, ¶ 4. Infospace, likewise has its principal place of business in Redmond, Washington and, importantly, does not maintain any offices in New Jersey. *See id.*, ¶ 5. Hoffer, moreover, made at least two separate trips to Washington in connection with his employment with Infospace. *See* Hoffer Corporate Amex Bill, attached as Ex. C to the A. Jain Aff.

Because a substantial amount, if not all, of the alleged culpable conduct occurred in Washington, not New Jersey, Washington has a stronger public interest in adjudicating this dispute. *See Lacey I*, 862 F.2d at 48; *Tischio*, 16 F.Supp.2d at 526; *Honeywell*, 817 F.Supp. at 486; *Mediterranean Golf*, 783 F.Supp. at 849–50.

### b. *Burden of Jury Duty*

The burden of jury duty "ought not to be imposed upon the people of a community which have no relation to the litigation." *Tischio*, 16 F.Supp.2d at 526 (quoting *Honeywell*, 817 F.Supp. at 486 (quotations omitted). *See Ferens v. John Deere Co.*, 494 U.S. 516, 529–30, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990) (citing *Gulf Oil*, 330 U.S. at 508–09, 67 S.Ct. 839)). In the instant action, "New Jersey jurors should not be burdened with adjudicating a matter concerning decisions and[,] or[,] conduct which occurred predominately outside the State of New Jersey." *Tischio*, 16 F.Supp.2d at 526; *Pain*, 637 F.2d at 792. Accordingly, this factor also weighs in favor of transfer to the Western District of Washington.

### c. *Applicable Law*

"An important public interest factor is the desire to have the case tried before judges familiar with the applicable law." *Tischio*, 16 F.Supp.2d at 526. *See Lony I*, 886 F.2d at 642; *Lacey I*, 862 F.2d at 48 (citing *Piper*, 454 U.S. at 251, 102 S.Ct. 252); *Rappoport*, 16 F.Supp.2d at 501; *Hudson United Bank*, 832 F.Supp. at 888. As mentioned, the instant action is predicated, in part, on the alleged breach of the 26 June 1996 Employment Agreement and the NDA. *See* Complaint; Answer/Counterclaims.

"Under New Jersey conflicts-of-law principles, the law of the state that has the most significant connections with the parties and the action applies." *Tischio*, 16 F.Supp.2d at 526 (citing *Gilbert*, 134 N.J. at 102–03, 629 A.2d 885). For the reasons discussed at length above, it appears Washington has the more significant contacts and the greater interest in adjudicating the instant matter. Accordingly, it appears that Washington State law shall apply to litigation arising out of the employment agreement reached between

Hoffer and the Defendants, there is a strong likelihood that Washington law applies to a majority, if not all, of the issues presented in the instant matter. The likely application of Washington law, therefore, further warrants transfer to the Western District of Washington, pursuant to Section 1404(a).

In sum, the transfer of this litigation to the Western District of Washington will promote the interests of justice. As discussed, given the location of the principal place of business of Infospace in Washington, the majority of the relevant facts pertaining to this litigation arose in Washington and the lack of a relative strong nexus between the underlying dispute and New Jersey, the enhanced convenience offered by trial in the Western District of Washington overcomes any argument by Hoffer that New Jersey is the proper forum for the trial of this matter.

*Conclusion*

For the foregoing reasons, the Motion to Transfer is granted; the action is transferred to the Western District of Washington.